NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
KERRY L. QUINN (Cal. Bar No. 302954)
SCOTT PAETTY (Cal. Bar. No. 274719)
Assistant United States Attorneys
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-5423 / 6527
    Facsimile: (213) 894-6269
    E-mail:   Kerry.L.Quinn@usdoj.gov
             Scott.Paetty@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 16-542(A)-AB-2 |
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | |
| INDIRA MOHABIR, | |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney and Assistant United States Attorneys Kerry L. Quinn and Scott Paetty, hereby files its sentencing position.

    This sentencing position is based upon the attached memorandum of points and authorities; the files and record in this case; and

//

//

//

//

such further evidence and argument as the Court may permit at the hearing on defendant's sentencing.

Dated: July 12, 2019

Respectfully submitted,

NICOLA T. HANNA
United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

          /s/
KERRY L. QUINN
SCOTT PAETTY
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

On December 17, 2018, after a three-day jury trial, defendant Indira Mohabir ("defendant") was found guilty of all counts charged in the 15-count First Superseding Indictment. On March 1, 2019, the United States Pretrial and Probation Office ("USPO") filed a Presentence Report [docket no. 138] ("PSR"), calculating a total offense level of 25, a criminal history category ("CHC") of I, and a recommended guideline range, under the United States Sentencing Guidelines ("USSG"), of 57-71 months. In its Sentencing Recommendation [docket no. 137], also disclosed on March 1, 2019, the USPO recommended a 46-month prison term, followed by a three-year period of supervised release. The government concurs in the PSR's guideline calculation, but disagrees with the recommended variance and submits that a low-end sentence of 57 months is appropriate for this case. The government also seeks a restitution order in the amount of $1,095,290.

**II.  STATEMENT OF FACTS**

Beginning at least by November 2014, and continuing until at least January 2015, defendant and co-defendant Phillip Cook ("Cook"), together with others, executed a scheme to defraud Western Federal Credit Union now doing business as Unify Financial Credit Union ("WFCU" or the "bank").

From August 2013 to January 2015, defendant was a business loan processor at WFCU. In this position, she was responsible for gathering loan applications and backup documentation from potential borrowers, running credit reports on those borrowers, obtaining tax transcripts from the IRS, and gathering other background information

necessary for underwriters to evaluate loan applications for WFCU's business lending group. Defendant was also responsible for processing loans for disbursements and opening lines of credit once they had been approved by underwriters. Defendant did not have any underwriting authority at the bank. (PSR ¶ 10.)

Defendant and Cook met through a business hotline that WFCU maintained for its customers. Defendant answered a call from Cook in approximately November 2014, and then they entered into an online romantic relationship through texts, calls, and emails that the two exchanged multiple times a day. Cook expressed his interest in opening unsecured lines of credit at WFCU, and defendant offered to assist him in doing this. (PSR ¶ 11.)

Cook provided defendant information about businesses and persons in whose names the lines of credit were to be opened. Defendant collected some documentation from Cook for these credit lines, and the two discussed by text and email how defendant could help Cook obtain loans and lines of credit at WFCU despite, and explicitly circumventing, the processes and procedures in place at the bank – with defendant working her self-described "magic" as needed. Defendant offered to skip required steps to get loans open, such as obtaining verified tax returns to ensure financials were real. Defendant further emailed Cook the bank's confidential policies and procedures, so the two could discuss how to get around them. Cook, in turn, sent defendant flowers, money, and expressions of love and affection, and he offered to take her on romantic vacations and pursue a long-term relationship with her. Defendant was unhappy at WFCU and looking for a new job, and joked about how she could go live

with Cook if anything happened with the loans and lines of credit that she was trying to open for him. (PSR ¶ 12.)

The two began their relationship in the middle of November 2014, and they immediately began discussing WFCU's confidential business information. Throughout December 2014, the two discussed the information that Cook should include on the forms that he submitted to the bank, but the one business loan application that she had given to an underwriter had been rejected (although she lied to a senior manager to get the $50,000 loan disbursed anyway). Defendant then came up with an idea of opening credit cards for Cook under a WFCU program called the Business Platinum Visa program. Defendant had the ability (but not the authority) to open these lines of credit on WFCU's systems. As defendant said to Cook by text: "Love you too....yes credit cards are easy and fast. I just type in $50,000 and the rate. No waiting on anyone. Maybe that's the new plan haha." (PSR ¶ 13.)

The credit limit under WFCU's Business Platinum Visa program was $50,000, so defendant started opening multiple $50,000 lines for Cook and his affiliated companies, keeping the lines capped at $50,000, at least at first. Defendant soon realized, however, as confirmed in texts and in the credit lines that she opened, that nothing in the system prevented her from going above the $50,000 limit, and that she could open new lines of credit at $100,000, and increase existing lines to $100,000. Defendant then opened, in the course of the next two weeks, between January 7, 2015, and January 20, 2015, more than $2.1 million of the approximately $2.6 million in total credit lines that she opened for Cook. On January 20, 2015, alone, she opened 10 credit lines, totaling nearly $1 million. (PSR ¶ 14.)

Defendant opened these unsecured lines of credit for Cook and businesses with which Cook was affiliated without the necessary documentation and application paperwork and without the necessary approvals from WFCU loan officers and supervisors. Cook knew that defendant was acting without authority of WFCU, and in violation of WFCU's policies and procedures, by approving the lines of credit. Cook would submit supporting documents that he knew to be false, such as tax returns, along with falsified information in credit applications in order to obtain loans and lines of credit, as part of their joint efforts to defraud the bank. (PSR ¶ 15.)

In the course of opening the credit lines, defendant bragged to Cook about having "too much access here," about getting "to do whatever I want," and said, "You're lucky you know me...no one here would have opened these accounts haha." She also admitted that she was overriding or trying to override the bank's internal controls. As she texted: "I can't open [C. and G.] account. Straight decline from the system. I can't override the system on this one. I'm sorry . . . [P.H.]: $ laundering history but system approved personal account for him and not the business." (PSR ¶ 16.)

She told Cook to send information to her personal email, and said that she could not open credit lines at certain times because her supervisor was around. She notably failed to mention the credit lines in the weekly reports that she sent to her supervisor – reports that were supposed to show her weekly activities, and she left them off of the weekly reports that she prepared for the business lending group of all the loans and lines of credit that the group had in the pipeline. (PSR ¶ 16.)

1    Cook and other co-conspirators would then draw down on the lines
2  of credit through transfers to other business accounts that Cook and
3  other co-conspirators controlled and through cashier's checks that
4  Cook and other co-conspirators obtained from WFCU and other
5  affiliated credit unions. Cook sent defendant gifts and checks and
6  suggested that he would take defendant on trips and continue to
7  engage in a romantic relationship with her in exchange for her
8  assistance in bypassing the necessary approvals at WFCU to open
9  unsecured lines of credit. (PSR ¶ 17.)
10    Numerous overt acts were committed in furtherance of this
11  scheme.  For example, as part of and in furtherance of the scheme,
12  Cook sent defendant a text message on January 5, 2015, that read: "Is
13  it too late to setup and fund Platinum card or possible." On January
14  5, 2015, defendant replied by text message, "I think it's possible
15  ... What do I get if I do it?" Cook responded in a text message, "A
16  kiss in person. Approx $20K from close of West coast deal for my
17  appreciation after done." Furthermore, Cook elicited defendant's
18  assistance in setting up a $100,000 line of credit at WFCU, to which
19  he knew he was not entitled, for Nationwide Autos, a company that
20  Cook controlled. On January 13, 2015, to facilitate the Nationwide
21  Autos line of credit, Cook sent a text message to defendant
22  requesting that defendant open a $100,000 line of credit for
23  Nationwide Autos. Defendant responded to Cook via text message, "I'll
24  sneak it in right now just for you," and then defendant confirmed
25  that the $100,000 credit line was open to which Cook responded, "XO
26  seriously."  (PSR ¶ 18.)
27    On January 20, 2015, after defendant opened nearly $1 million in
28  credit lines for Cook on that day alone, he sent her, by Federal

1  Express overnight delivery, a $50,000 cashier's check drawn from one
2  of those lines. Meanwhile, as they were texting about the $50,000
3  check, an internal auditor/fraud investigator at WFCU was reviewing a
4  routine audit report, and discovered the unauthorized lines of
5  credit. The auditor identified and froze the accounts on the morning
6  of January 21, 2015. Defendant was watching the systems that morning
7  and noticed that the accounts had been frozen. She immediately warned
8  Cook, telling him in a series of texts: "Oh no baby I can't see
9  anything at all[.] The note says no transactions allowed[.] Can't
10 even see account[.] So hurry and transfer before anything happens
11 haha." (PSR ¶ 19.)
12     WFCU froze the accounts and seized as much of the funds as
13 possible, including intercepting the $50,000 check when it arrived at
14 WFCU's offices on January 21, 2015, addressed to defendant from Cook.
15 In an interview with the bank, defendant admitted that she should not
16 have opened credit lines, and she expressed remorse and regret at
17 having done so. WFCU immediately reported the incident to the
18 Hawthorne Police Department ("HPD"), which responded to the scene and
19 arrested defendant. Defendant gave HPD officers consent to search her
20 phone, which revealed the text messages detailed above. In an
21 interview, defendant admitted she knew Cook and had opened the credit
22 lines for him. (PSR ¶ 20.) Defendant has otherwise expressed no
23 remorse or regret for her criminal conduct and instead indicated, in
24 text messages that she exchanged with Cook long after the offense
25 conduct in this case, that she would do it again if given the
26 opportunity to do so. She appears to have romanticized the "Bonnie
27 and Clyde" type relationship that she had with Cook. Gov't Trial
28 Memo, at 20 [docket no. 103].

In total, defendant opened 28 lines of credit for Cook and his affiliated companies, and she caused the unauthorized disbursement of a $50,000 business loan, for a total of approximately $2.7 million in unauthorized credit lines and loans, and she caused approximately $1.1 million in losses after Cook and other co-conspirators drew down on the lines of credit and failed to pay the bank back. (PSR ¶ 17; Trial Exhibit 222.)

**III. ARGUMENT**

As explained below, the government recommends that defendant be sentenced to a low-end sentence of 57 months in prison, a three-year term of supervised release, and that the Court order restitution in the amount of $1,095,290.

    **A. Advisory Sentencing Guidelines**

As calculated in the PSR, the government submits that the following advisory sentencing guidelines apply:

| | | |
|---|---|---|
| Base Offense Level: | 7 | USSG §§ 2X1.1, 2B1.1(a)(2) |
| Fraud loss is greater than $1,500,000 but less than $3,500,000 | +16 | USSG § 2B1.1(b)(1)(I) |
| Abuse of position of trust | +2 | USSG § 3B1.1(a) |
| Total Offense Level | 25 | |

PSR ¶¶ 26-41. The government agrees with the PSR's reasoning for the application of the above guidelines.

    **B. Analysis of the § 3553(a) factors**

The government submits that a low-end sentence of 57 months is sufficient but not greater than necessary to comply with the sentencing goals set forth in 18 U.S.C. § 3553(a).

7

The factors to be considered when imposing sentence, as set forth in 18 U.S.C. § 3553(a), include:

> (1) The nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) The need for the sentence imposed –
>
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>     (B) to afford adequate deterrence to criminal conduct; [and]
>
>     (C) to protect the public from further crimes of the defendant . . .
>
> (3) The kinds of sentences available;
>
> (4) [the applicable sentencing guidelines];
>
> (5) [the applicable sentencing guidelines policy statement];
>
> (6) The need to avoid unwarranted sentence disparities among defendants who have been found guilty of similar conduct; and
>
> (7) The need to provide restitution to the victims of the offense.

18 U.S.C. § 3553(a).

In addition to the applicable sentencing guidelines [factor 4], factors important to the government's sentencing recommendation are discussed below.

    1. <u>Nature and Circumstances of the Offense</u>

Defendant engaged in very serious criminal conduct, and she deserves a significant prison sentence. Defendant was the one with inside access to the bank, and she used this access to allow Cook to profit at the bank's expense. Not only did defendant share the bank's internal policies and procedures with Cook so they could discuss how to get around them, she abused her access to the bank's

8

internal systems to be able to open the unauthorized credit lines – allowing Cook and his associates to steal from the bank. She was the one that knew how to override the bank's internal controls, and she was the one who came up with the plan to open credit lines under the bank's Business Platinum Visa program. She knew that she had access to the bank's systems to be able to do this, and that she could open these lines without further approval or oversight. Put simply, she was the one who came up with the criminal plan – it was her idea. Defendant also engaged in egregious behavior in opening lines of credit for individuals that she knew had prior criminal history, outstanding judgments, and terrible credit – people who were not eligible for membership at the bank, much less extensions of credit. Defendant's conduct was knowing, calculated, and egregious. She opened nearly thirty lines of credit, totaling nearly $3 million, and caused more than $1 million in losses.

    2. <u>History and Characteristics of Defendant</u>

 Defendant is no innocent victim here. She chose to abuse her position at the bank. She chose to violate bank policy. She chose to steal. Nobody forced her to open the credit lines that she opened; nobody forced her to override the bank's controls; nobody forced her to conspire with Cook; she did this of her own free will. Unlike many of the criminal defendants that this Court sees, defendant had a supportive upbringing, and wonderful family relationships. She was educated, and able to obtain and maintain consistent employment. She has no history of mental illness or issues with drugs or alcohol. In short, she faced none of the hardships or challenges that many criminal defendants face. Defendant had a choice in her life, and she chose to engage in

criminal conduct.  Her motivations for opening credit lines and her susceptibility to Cook's promises may explain but do not excuse her conduct.  And she certainly has no excuse for continuing to engage in criminal conduct after she left the bank.  In text messages and emails that she sent to Cook in the months and years that followed her arrest, she demonstrated that she would do it all again if she could.  Defendant went to work at another bank after WFCU terminated her employment, and texts and emails show that she was again trying to abuse her inside position to open even more credit lines for Cook.  Nothing excuses this conduct.  Defendant must face serious consequences for her actions.

        3.    <u>Deterrence</u>

The sentence that this Court imposes must send a deterrent message to defendant herself, discouraging her from engaging in future criminal conduct.  As stated above, defendant has shown that, but for the consequences that she faces, she would do it all again, and that she will continue to engage in criminal activity if she is not sufficiently discouraged from doing so.  A significant prison sentence is particularly important for this defendant because she still refuses to accept responsibility for her conduct, refusing to acknowledge that she did anything wrong, or that she should bear any responsibility or face any consequences for the large fraud scheme that she perpetrated, all of which indicates a strong possibility of recidivism.  The sentence should also send a strong warning to others that insider bank fraud is taken seriously and punished accordingly.  It should cause other bank insiders to think twice before they abuse their inside position for their own or others' personal gain.  All in

all, a sentence of 57 months is sufficient but not greater than necessary to serve the sentencing goals of 18 U.S.C. § 3553(a).

## IV. RESTITUTION

In addition to the period of incarceration, defendant should be ordered to make full restitution to the victims of her crimes. The Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A and § 3664, applies to "an offense against property under this title . . . including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii). Under the MVRA, a district court must order restitution in such a case where "an identifiable victim or victims has suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). With this statutory background, this Court is required to impose an order of restitution in this case in favor of the victims for the full amount of their losses, without consideration of the defendants' ability to pay that amount. 18 U.S.C. § 3664(f)(1)(A); USSG § 5E1.1 (directing the sentencing court to enter a restitution order if there is an identifiable victim). The government is seeking a restitution order in the amount of $1,095,290, of which $1,045,290 should be paid to CUMIS Insurance Society, Inc., and $50,000 (representing the deductible on the bank's insurance policy) should be paid to Unify Financial Credit Union (as WFCU's acquiring institution).

## V. CONCLUSION

For the reasons set forth above, the government recommends that defendant be sentenced to a 57-month term of imprisonment, a three-year period of supervised release, and ordered to pay $1,095,290 in restitution.